# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (SOUTHERN DIVISION)

| | |
|---|---|
| Debra J. Brent, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )    **Civil Action No.** PWG 14-cv-1705 |
| | ) |
| Priority 1 Automotive Group, Inc., *et al.*, | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Date: December 14, 2015

Respectfully submitted,

____/S/_____

Robert B. Fitzpatrick, Esq.
ROBERT B. FITZPATRICK, PLLC
1825 Connecticut Avenue, N.W., Suite 640
Washington, D.C. 20009-5728
(202) 588-5300 (phone)
(202) 588-5023 (fax)
fitzpatrick.law@verizon.net (email)

## TABLE OF CONTENTS

I.   Introduction ............................................................................................................. 1

II.   Executive Summary of Argument .......................................................................... 1

III.   Statement of Material Facts Which Plaintiff Contends are not in Genuine Dispute ................. 3

   a.   Parties ................................................................................................................ 3

   b.   Background ....................................................................................................... 4

   c.   The Written Arbitration Policies ..................................................................... 5

      1.   Facts ............................................................................................................. 5

      2.   Authenticity of Documents ....................................................................... 7

   d.   The Maryland Uniform Electronic Transactions Act, Md. Commercial Law § 21-101 *et seq.* ... 8

IV.   Argument .................................................................................................................. 8

   a.   Standard of Review ........................................................................................... 8

   b.   There Was No Consideration for the Purported Agreement to Arbitrate ............. 10

      1.   Defendants' Promise to Arbitrate Disputes is Illusory, Unenforceable, and Incapable of Providing Consideration for Any Agreement to Arbitrate the Instant Dispute ............. 10

      2.   Neither Empoyment nor Continued Employment Can Constitute Consideration for an Arbitration Agreement in Maryland ............. 12

      3.   The Attached Policy Was Not a Contract and Could Be Modified at Any Time ............. 13

   c.   The Handbook Policy and the Attached Policy are Not Contracts Because Priority 1 Unambiguously Indicated That They Were Not Contracts ............. 15

      1.   Contractual Formation ............................................................................. 15

      2.   The Handbook, Acknowledgment, and Included Attached Policy, are Not Contracts ....... 15

   d.   The Maryland Uniform Electronic Transactions Act ................................... 18

      1.   The Maryland Uniform Electronic Transactions Act Provides That Electronic Signatures Are Only Valid When The Parties Have Agreed to Conduct Transactions By Electronic Means 18

      2.   Any Electronic Signature Made by Ms. Brent Is Invalid Because She Did Not Agree to Conduct Transactions By Electronic Means ............. 19

      3.   The Circumstances Surrounding Ms. Brent's Alleged Electronic Signature Do Not Support An Inference That She Agreed to Conduct Transactions By Electronic Means ............. 20

   e.   No Meeting of the Minds ................................................................................. 21

      1.   There Was No Meeting of the Minds on Material Terms of any Purported Agreement to Arbitrate ............. 21

2.   There Was No Meeting of the Minds As to the Effect of the Offer of Employment Confirmation .................................................................................................................................23

V.   Conclusion ....................................................................................................................................25

## I.   INTRODUCTION

Plaintiff, Ms. Debra J. Brent (hereafter, "Plaintiff" or "Ms. Brent"), through her undersigned counsel, hereby respectfully submits this Memorandum in Support of her Motion for Summary Judgment as to whether the arbitration policies at issue constitute an enforceable agreement to arbitrate the instant dispute.  Based on the undisputed facts, including the Affidavit of Ms. Nancy Delach, Defendant Priority 1 Autmotive Group, Inc.'s ("Priority 1") Human Resources Manager, no reasonable factfinder could conclude that the instant dispute should be submitted to arbitration.

## II.   EXECUTIVE SUMMARY OF ARGUMENT

An agreement to arbitrate – like any contract – must be supported by consideration, and must be clear as to its essential terms.  Even more fundamentally, a document which expressly states that it is not a contract should not be treated as one.  Finally, under Maryland statutory law, party cannot be bound by an electronic signature unless they have agreed to conduct transactions by electronic means.  Summary judgment should be granted in this matter because the purported arbitration agreement fails each of the above tests.

Defendants' agreement to arbitrate disputes is illusory, unenforceable and, as such, incapable of providing consideration for any promise by Ms. Brent to arbitrate.  This is because Defendants have the right to "change, abolish or modify existing policies…with or without notice."  The Maryland Court of Appeals has held that strikingly similar language would "allow [Defendant] to revoke the [Arbitration Policy] even after arbitration is invoked, and even after a decision is rendered[.]"  *Cheek v. United Healthcare of the Mid-Atl., Inc.*, 378 Md. 139, 148, 835 A.2d 656, 662 (Md. 2003).  In sum, Defendants' purported promise to arbitrate is "no real promise, and therefore, insufficient consideration to support an enforceable agreement to arbitrate."  *Id.*

*Cheek* similarly established, more than a decade ago, that neither employment nor continued employment is capable of serving as consideration for an arbitration agreement.  *Id.* at 667.  Here, it

is undisputed that the earliest date on which Ms. Brent allegedly electronically signed a supposed

arbitration agreement was nearly three weeks after her employment with Priority 1 commenced.

Additionally, the arbitration agreement is not a contract because Defendants repeatedly state

that it is not a contract.  Page two of Defendants' Company Policy and Employee Handbook states

that "[t]he policies contained in this Handbook do not create any contract of employment, nor do

they constitute the terms of an implied agreement with the [Defendants]."  *See* Exhibit B, Joint

Record (the "JR") Bates No. 7.  Likewise, the Acknowledgment of Receipt states that "this

[Handbook] constitutes management guidelines only and is neither to be interpreted as a contract

between [Defendants] and me, nore does it constitute a guarantee that my employment will

continue[.]"  *See* Ex. C, JR Bates No. 100.  When Defendants repeatedly state that their Handbook is

not a contract, this Court must take them at their word.  *See Lorenzo v. Prime Communs., L.P.*, Nos. 14-

1622, 14-1727, 2015 U.S. App. LEXIS 20400 (4th Cir. Nov. 24, 2015) (refusing, under North

Carolina law, to enforce an arbitration agreement based on the presence of a disclaimer of

contractual intent).

Even if the arbitration agreement were otherwise valid, it would be unenforceable because

there is no evidence that Ms. Brent agreed to be bound by it.  Defendants' attempt to controvert this

fact rests on a single sentence fragment and Ms. Brent's supposed electronic signature.  The

Maryland Electronic Transactions Act forecloses the use of the latter because the undisputed facts

demonstrate that Ms. Brent never agreed to conduct transactions by electronic means.  The

substantial ambiguity regarding the meaning of the sentence fragment, meanwhile, must be resolved

in favor of Ms. Brent, as Defendants – not she – drafted the document in which it appears.

In sum, the undisputed facts demonstrate that the supposed arbitration agreement was not a

contract, was not supported by consideration, and was not validly entered into by Ms. Brent.  Even

if the foregoing were not the case, however, the basic question would remain: *to what*, precisely, had

Ms. Brent agreed, as it is well-established that a contract may not be "vague or uncertain in its essential terms." *Robinson v. Gardiner*, 196 Md. 213, 217, 76 A.2d 354 (Md. 1950). The agreement at issue lacks the most basic, material, terms: the manner in which the arbitrator is to be selected, and the rules under which the arbitrator is to proceed. As Judge Blake explained in *Raglani v. Ripken Prof'l Baseball*, the lack of rules "combined with the [arbitration policy's] few sentences about discovery…[and] the lack of any neutral arbitrator selection mechanism…casts serious doubt that the agreement would guarantee a fair process by which to arbitrate [Plaintiff's] claims." 939 F. Supp. 2d 517, 525 (D. Md. 2013).

Each of the above arguments is independently fatal to Defendants' attempt to compel the arbitration of this matter. Taken together, no reasonable factfinder could conclude that Defendant has carried its burden of demonstrating that the parties entered an enforceable agreement to arbitrate.

## III.   STATEMENT OF MATERIAL FACTS WHICH PLAINTIFF CONTENDS ARE NOT IN GENUINE DISPUTE

The pertinent background is set forth in the Statement of Material Facts Not in Genuine Dispute (the "Undisputed Facts" or "UF") attached as Attachment 1. These facts are provided again herefor the convenience of the reader.

### a.  Parties

1) Plaintiff is a resident of the State of Maryland[*].

2) Defendant Priority 1 is a Maryland corporation, with its principal office located at 110 West Road, Suite 500, Towson, MD 21204[*].

3) Defendant BMW of Rockville is the trade name of Rockville Cars, LLC[*].

---

[*] Although otherwise unsupported, based on conversations with defense counsel, plaintiff's counsel believes that Defendants will not dispute this fact.

4) Rockville Cars, LLC is a limited liability corporation organized and existing under the laws of Maryland which has its principal office at 700 Kennilworth Drive, Towson, MD 21204. *See* Articles of Transfer, Exhibit G, JR Bates No. 117 (the "Articles").

5) Priority 1 is the sole member of Rockville Cars, LLC. *See* Articles, Bates No.119.

6) Rockville Cars, LLC is the sole owner of the car dealership where Ms. Brent worked at the time of her termination on September 27, 2012, which traded under the name BMW of Rockville. *See* Articles, Bates No. 116 to 119.

**b. Background**

7) In October of 2011, Ms. Brent was hired as a Client Advisor by VOB BMW of Rockville, a non-party to this suit[*].

8) The term "Client Advisor" refers to a sales representative[*].

9) On March 1, 2012, Rockville Cars, LLC became the new owner and operator of the dealership[*].

10) The Articles of Transfer for this sale were filed with the Maryland Secretary of State on March 5, 2012. *See* Articles, Bates No. 116.

11) The Articles of Transfer were signed on behalf of Rockville Cars, LLC by Mr. Louis Cohen. *See* Articles, Bates No. 119.

12) The Articles of Transfer indicate that Mr. Louis Cohen signed as the President of "Priority 1 Automotive Group, Inc." *See* Articles, Bates No. 119.

13) The Articles of Transfer indicate that Priority 1 was the "Sole Member" of Rockville Cars, LLC. *See* Articles, Bates No. 119.

14) Following the purchase of the dealership by Rockville Cars, LLC Ms. Brent was an employee of Rockville Cars, LLC, as of March 1, 2012[*].

---

[*] Although otherwise unsupported, based on conversations with defense counsel, plaintiff's counsel believes that Defendants will not dispute this fact.

4

**c.   The Written Arbitration Policies**

1. <u>Facts</u>

15) Between March 1, 2012 and September 27, 2012, Priority 1 had an Employee Handbook. *See* Company Policy and Employee Handbook, Exhibit B, JR Bates Nos. 2 to 99 (the "Handbook").

16) Page 28 of the Handbook (Bates Nos. 33, 102) contains a provision titled "Binding Arbitration Program" (the "First Document" or "Handbook Policy").  *See* Binding Arbitration Program, Exhibit E, JR Bates No. 102 (the "First Document" or "Handbook Policy").

17) Between March 1, 2012 and September 27, 2012, Priority 1 also had a form titled "COMPANY POLICY AND EMPLOYEE HANDBOOK ACKNOWLEDGMENT OF RECEIPT".  *See* Company Policy and Employee Handbook Acknowledgment of Receipt, Exhibit C, JR Bates No. 100 (the "Acknowledgment").

18) Between March 1, 2012 and September 27, 2012, Priority 1 also had a form which contained sections titled "Arbitration" and "Consent to Obtaining Consumer Reports".  *See* Arbitration and Consent to Obtaining Consumer Reports, Exhibit D, JR Bates No. 101 (the "Second Document" or "Attached Policy").

19) On November 4, 2011, Mr. Louis Cohen issued a memo under his name which discussed the Handbook.  *See* Memo from L. Cohen, Exhibit A, JR Bates No. 1 (the "Cohen Memo").

20) The Handbook states, at Ex. B, JR Bates No. 7, that Priority 1 had complete authority to "enforce, change, abolish or modify existing policies…as the [Priority 1] may consider necessary with or without notice."

21) The Handbook states, at Ex. B, JR Bates No. 94, that "[t]he Company has the right…to make and enforce new policies and to enforce, change, abolish or modify existing policies, procedures or benefits applicable to employees as it may deem necessary or advisable."

22) The Handbook states, at Ex. B, JR Bates No. 7, that "[t]he policies contained in this Handbook do not create any contract of employment, nor do they constitute the terms of an implied agreement with [Priority 1]."

23) The Acknowledgment states, at Ex. C, JR Bates No. 100, that:

> [T]his **Company Policy and Employee Handbook** constitutes management guidelines only and is neither to be interpreted as a contract between **Priority 1 A.G., nor its dealerships** and me, nor does it constitute a guarantee that my employment will continue for any specified period of time or end only under certain conditions. I understand that neither this Handbook nor any other communication by a management representative is in any way intended to create an express or implied contract of employment.

> (Emphasis in Original)

24) The Acknowledgment also states, at Ex. C, JR Bates No. 100, that Priority 1 "reserves the right to modify, supplement, amend or delete any of the policies or benefits contained in this Handbook and to add additional policies without prior notice at any time."

25) The Second Document designates the "Maryland state board of mediation," as the arbitrator of any disputes between the parties. *See* Ex. D, JR Bates No. 101.

26) No entity titled the "Maryland state board of mediation" currently exists, or existed at any time between March 1, 2012 and September 27, 2012[*].

27) There exists no Maryland State entity which provides arbitration services in employment disputes for employers other than the State of Maryland, and no such entity existed between March 1, 2012 and September 27, 2012[*].

---

[*] Although otherwise unsupported, based on conversations with defense counsel, plaintiff's counsel believes that Defendants will not dispute this fact.

6

28) The Second Document does not specify the rules to be used in arbitration[*].

29) Ms. Nancy Delach, a Human Resources Manager employed by Priority 1, filed an Affidavit on October 20, 2014 (ECF No. 15, attachment 1) in which she stated that "on March 19, 2012, [Ms.] Brent logged into the aforesaid web portal...viewed the Company Policy and Employee Handbook (including accompanying Dispute Resolution via Arbitration Policy), and electronically signed an acknowledgment of her receipt thereof and agreement thereto." *See* Affidavit of Nancy Delach, Exhibit F, JR Bates No. 106, 111 (the "Delach Aff.").

   2. Authenticity of Documents

30) The Cohen Memo (Ex. A, JR Bates No. 1) is a true and authentic copy of a memo dated November 4, 2011.

31) The Handbook (Ex. B, JR Bates Nos. 2 to 99) is a true and authentic copy of the complete Handbook in use by Priority 1 between March 1, 2012 and September 27, 2012.

32) The Acknowledgment (Ex. C, JR Bates Nos. 100) is a true and authentic copy of the Acknowledgment which Priority 1 asserts, through Ms. Nancy Delach, its Human Resources Manager, was provided to Ms. Brent in electronic form on March 19, 2012.

33) The Second Document (Ex. D, JR Bates No. 101) is a true and authentic copy of the Second Document which Priority 1 asserts, through Ms. Nancy Delach, its Human Resources Manager, was provided to Ms. Brent in electronic form on March 19, 2012. *See* Delach Aff. Ex. F, JR Bates Nos. 106, 111.

34) The Parties disagree as to whether the Acknowledgment (Ex. C, JR Bates No. 100) and the Attached Policy (Ex. D, JR Bates No. 101) were one, double-sided document or two, separate, documents.

---

[*] Although otherwise unsupported, based on conversations with defense counsel, plaintiff's counsel believes that Defendants will not dispute this fact.

**d. The Maryland Uniform Electronic Transactions Act, Md. Commercial Law § 21-101 *et seq.***

35) At no point between March 1, 2012 and September 27, 2012 did Ms. Brent physically or electronically sign a separate and optional agreement the primary purpose of which was to authorize a transaction to be conducted by electronic means.

36) At no point between March 1, 2012 and September 27, 2012 did Ms. Brent sign an agreement which contained a conspicuously displayed, and separately consented to, provision which authorized a transaction to be conducted by electronic means.

## IV. ARGUMENT

### a. Standard of Review

Motions to compel arbitration "exist in the netherworld between a motion to dismiss and a motion for summary judgment." *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 589, 2013 U.S. Dist. LEXIS 160215, *14-15, (D. Md. 2013) (Bennett, J.). When, as here, the "formation or validity" of the arbitration agreement is in dispute, a motion to compel arbitration is treated as one of summary judgment.

A dispute may be submitted to arbitration only when the parties to the dispute have all unambiguously agreed to submit that dispute to arbitration. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995). As this Court has held, "[b]efore dismissing a suit or compelling arbitration… the court must determine whether the arbitration agreement that is claimed to govern the dispute between the parties is valid and enforceable." *Raglani v. Ripken Prof'l Baseball*, 939 F. Supp. 2d 517, 2013 U.S. Dist. LEXIS 53962, *7 (D. Md. 2013) (citing *Noohi v. Toll Bros.*, 708 F.3d 599, 603, 605-06 (4th Cir. 2013); *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 937-38 (4th Cir. 1999)). Whether an arbitration agreement exists depends on "state-law principles that govern the formation of contracts." *Id.* at 944. This inquiry "is focused both on ensuring there was adequate contractual formation in the agreement, including valid consideration, and that the agreement itself is not unfair,

unconscionable, or otherwise defective in ensuring the claimant can 'effectively… vindicate his or her statutory cause of action in the arbitral forum.'" *Raglani*, 939 F. Supp. 2d at 521 (quoting *Murray v. United Food & Commercial Workers Int'l Union*, 289 F.3d 297, 302 (4th Cir. 2002)); *see also Hooters of Am.*, 173 F.3d at 938.

At this stage, there is no presumption in favor of arbitration.  As the Tenth Circuit explained:

> Everyone knows the Federal Arbitration Act favors arbitration. **But before the Act's heavy hand in favor of arbitration swings into play, the parties themselves must agree to have their disputes arbitrated.** While Congress has chosen to preempt state laws that aim to channel disputes into litigation rather than arbitration, even under the FAA it remains a 'fundamental principle' that 'arbitration is a matter of contract,' not something to be foisted on the parties at all costs.

*Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014) (emphasis added) (internal citations omitted); *see also Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. N.Y. 2011) ("while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made").

Finally, as the Maryland Court of Appeals has long held:

> [N]o action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain in its essential terms. The parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If the agreement is so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties. Such a contract cannot be enforced in equity nor sued upon in law. For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties.

*Robinson v. Gardiner*, 196 Md. 213, 217, 76 A.2d 354 (Md. 1950) (internal citations omitted).

**b.  There Was No Consideration for the Purported Agreement to Arbitrate**

There is no enforceable agreement to arbitrate the instant dispute because Ms. Brent never received valid consideration for such an agreement.  This is because neither employment nor continued employment can serve as consideration for an agreement to arbitrate under Maryland law and Defendants' promise to arbitrate is illusory and unenforceable. *See Cheek v. United Healthcare of the Mid-Atl., Inc.*, 378 Md. 139, 149, 835 A.2d 656, 662-67 (Md. 2003).

1.  Defendants' Promise to Arbitrate Disputes is Illusory, Unenforceable, and Incapable of Providing Consideration for Any Agreement to Arbitrate the Instant Dispute

Defendants agreement to arbitrate is illusory because it had the authority to unilaterally modify its arbitration policies at any time, without notice.  On page 2, the Handbook states that:

> [t]he Company reserves the right to make and enforce new policies or procedures, and to enforce, change, abolish or modify existing policies and benefits as the Company may consider necessary with or without notice.

*See* Handbook at Ex. B, JR Bates No. 7.  This provision provides Priority 1 with the unrestrained authority to unilaterally modify the Arbitration Policies.  Priority 1's ability to unilaterally modify or revoke its policies, including its arbitration policies, is reiterated again both at the end of the Handbook and in the Acknowledgment.  Page 89 of the Handbook states that "[t]he Company has the right…to enforce, change, abolish or modify existing policies, procedures, or benefits applicable to employees as it may deem necessary or advisable."  Handbook, Ex. B, JR Bates No. 94.  The Acknowledgment reiterates Priority 1's ability to modify or revoke any of its policies, including the arbitration policy: "**Priority 1 A.G.** reserves the right to modify, supplement, amend or delete any of the policies or benefits contained in this Handbook…without prior notice at any time."  Acknowledgment at Ex. B, JR Bates No. 100 (emphasis in original).

Arbitration policies which can be unilaterally changed, abolished, or modified unilaterally by one party are unenforceable. *See Cheek v. United Healthcare of Mid-Atlantic, Inc.*, 378 Md. 139, 148-52,

10

835 A.2d 656 (2002) (holding that Defendant's ability to "alter, amend, modify, or revoke" the arbitration policy "at its sole and absolute discretion at any time with or without notice creates no real promise") *citing Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1217 (10th Cir. 2002) (ability to unilaterally revise arbitration clause rendered clause illusory and unenforceable); *Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 759, 761 (7th Cir. 2001) (arbitration agreement was illusory and unenforceable where one party had unilateral right to amend arbitration rules); *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306 (6th Cir. 2000) (same); *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 593-94 (D. Md. 2013) (holding that because "[the arbitration] policy is subject to change at the sole discretion of [Defendant]…[Defendant]'s promise to arbitrate is therefore illusory.").

Over a decade ago the Maryland Court of Appeals held that the ability to unilaterally modify or revoke an arbitration policy renders the employer's promise to arbitrate illusory. *Cheek*, 835 A.2d at 662. In *Cheek* the defendant had the right to "alter, amend, modify or revoke" the arbitration policy "at any time with or without notice." *Id.* at 658. The Court of Appeals held that "[Defendant's]…right to alter, amend, modify, or revoke the [Arbitration] Policy at its sole and absolute discretion at any time with or without notice creates no real promise, and therefore, [is] insufficient consideration to support an enforceable agreement to arbitrate." *Id.* at 662; *see also Lizalde v. Vista Quality Markets*, 746 F.3d 222, 225-26 (5th Cir. 2014) ("Where one party has the unrestrained unilateral authority to terminate its obligation to arbitrate, however, the agreement understandably is illusory") (internal quotations and citations omitted).

Here, as in *Cheek*, Priority 1's promise to arbitrate does not serve as consideration for the arbitration agreement because Priority 1 had the authority to "change, abolish or modify existing policies and benefits as the Company may consider necessary with or without notice[.]" *See* Handbook at Ex. B, JR Bates No. 7. This language largely tracks the language that the Court of

Appeals found rendered illusory the employer's promise to arbitrate in *Cheek*. Also significant is the fact that, as in *Cheek*, Defendants nowhere exempt the arbitration policies from their ability to unilaterally, and at any time, modify or abolish its policies. *See Cheek*, 835 A.2d at 663 *citing Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1217 (10th Cir. 2002).

> 2.   Neither Empoyment nor Continued Employment Can Constitute Consideration for an Arbitration Agreement in Maryland

Neither employment nor continued employment can serve as consideration for an arbitration agreement. *See Cheek v. United Healthcare of the Mid-Atl., Inc.*, 378 Md. 139, 154-55, 835 A.2d 656 (2003). In *Cheek*, the Maryland Court of Appeals held that "[Defendant's] **employment or continued employment** of [Plaintiff] does not act as consideration in return for [Plaintiff's] promise to arbitrate[.]" *Id.* at 155 (emphasis added). In so holding, the Court reviewed the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and determined that "[t]o agree with [Defendant] would place this Court in the untenable position of having to go beyond the confines of the arbitration agreement itself and into an analysis of the validity of the larger contract, an inquiry which we cannot make." *Id.* at 154. Similarly, in *Shaffer v. ACS Gov't Servs.*, Judge Alexander Williams, Jr., explained that "[t]he Maryland Court of Appeals, nevertheless, made clear that continued employment was not adequate consideration for an arbitration agreement." 321 F. Supp. 2d 682 (D. Md. 2004).

This holding was recently reiterated by Judge Bennett in *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 591 (D. Md. 2013). In *Caire*, Judge Bennett explained that "[e]mployment or continued employment cannot act as consideration for an employee's promise to arbitrate." *Id.* In so doing, Judge Bennett noted that "Defendants cannot escape the rule clearly stated in *Cheek* by placing explicit language in the arbitration provision [to the contrary]." *Id.*; *see also Raglani v. Ripkin Prof. Baseball*, 939 F. Supp. 2d 517 (D. Md. 2013) (holding that an arbitration clause

which "create[d] a binding egal obligation [to arbitrate]…in consideration of [plaintiff's] **hiring for**

**employment** or [her] continued employment," was not supported by consideration under *Cheek*)

(emphasis added).

Here, the Attached Policy states that the consideration received by Ms. Brent was

"employment and continued employment" with Defendants.  *See* Attached Policy at Ex. D, JR Bates

No. 100.  In fact, the undisputed facts demonstrate that Ms. Brent did not electronically sign the

Handbook Policy, the Acknowledgment, or the Attached Policy – if she ever did[1] – until at least

March 19, 2012, almost three full weeks after she became an employee of Priority 1.  *See* Delach Aff.

Bates Nos. 106, 111.

3.  The Attached Policy Was Not a Contract and Could Be Modified at Any Time

Both the Handbook Policy and the Attached Policy are subject to the disclaimers of

contractual intent, and the unilateral ability of Priority 1 to modify its policies.  In *Caire v. Conifer*

*Value Based Care, LLC*, Judge Bennett addressed facts similar to those present in this case.  982 F.

Supp. 2d 582, 585-86 (D. Md. 2013).  In *Caire*, the defendant had propounded an arbitration policy

in its handbook.  *Id.*  The section of the handbook which contained the arbitration policy was

separately agreed to and had its own signature block.  *Id.* at 586.  Defendant had also propounded an

document entitled "Receipt and Acknowledgment of [Defendant] Employee Manual" which

acknowledged receipt of the handbook, and which specifically acknowledged agreement to the

arbitration policy.  *Id.*  In *Caire*, the Court held that the Arbitration Agreement was unenforceable

based, in part, on the fact that – despite being separately consented to and separately acknowledged

– the defendant had the power to unilaterally modify the arbitration policy.  *Id.* at 592-93.

---

[1] The parties are in dispute as to whether plaintiff electronically signed "the Company Policy and
Employee Handbook (including accompanying Dispute Resolution via Arbitration Policy)".  *See*
Reply in Support of Defendant's Motion to Dismiss and Compel Arbitration, p. 2 (October 20,
2014) (ECF No. 15); Plaintiff's Supplemental Memorandum in Opposition to Defendants' Motion
to Dismiss and Compel Arbitration, p. 9 (Nov. 11, 2014) (ECF No. 21).  That dispute is not before
the Courrt in the context of this Motion for Summary Judgment.

The facts in *Caire* are strikingly similar to the undisputed facts in this case.  Here, as in *Caire*, defendant has issued a handbook which contained an arbitration policy.  Here, as in *Caire*, there was an acknowledgment form which noted the employee's agreement to abide both by the handbook and by the arbitration policy.  Here, as in *Caire*, the acknowledgment form provided that Priority 1 could "modify, supplement, amend or delete any of the policies or benefits contained in this Handbook…without prior notice at any time."  Here, as in *Caire*, the arbitration policy contained its own signature block.  The fact that, in *Caire*, the acknowledgment form contained an acknowledgment of the separately-consented-to arbitration policy while here, the acknowledgment form contained a similar (though not identical) arbitration policy to that set forth in the Handbook is of no moment.

Defendant itself viewed the Handbook Policy and Attached Policy as complimentary portions of a single Arbitration Policy.  On October 20, 2014, Defendants' Human Resources Manager, Ms. Nancy Delach, signed an affidavit to which she attached both the Handbook Policy and the Attached Policy.  *See* Delach Aff. at Ex. F, JR Bates Nos. 103 to 115.  Ms. Delach referred to these documents as "(collectively, [the] 'Arbitration Agreement')".  *See* Delach Aff., Ex. F, JR Bates No. 106.  Throughout her affidavit, Ms. Delach repeatedly asserts that Ms. Brent electronically signed a single document, which she referred to as "the Company Policy and Employee Handbook (including accompanying Dispute Resolution via Arbitration Policy)".  *Id* at Ex. F, JR Bates Nos. 104, 105, 106.  Likewise, Defendants referred to these two documents, collectively, as the "Arbitration Agreement" in motions before this Court.  *See* Defendant's Motion to Dismiss and Compel Arbitration, par 3, p. 2-3 (Aug. 14, 2014) (ECF No. 6).  In so doing, Defendants have admitted that the "Arbitration Agreement" was contained in the Handbook.  *See Id.* ("The Company Policy and Employee Handbook contained arbitration provisions" and defining those provisions at the "Arbitration Agreement").

14

Indeed, the argument for enforcing the arbitration policy was, if anything, stronger in *Caire*. In *Caire*, the plaintiff both separately signed the arbitration policy, an acknowledgment of the handbook, and an acknowledgment specifically mentioning the arbitration policy.  By contrast, here Ms. Brent provided a single electronic signature which Defendants applied to "the Company Policy and Employee Handbook (including accompanying Dispute Resolution via Arbitration Policy".

### c.  The Handbook Policy and the Attached Policy are Not Contracts Because Priority 1 Unambiguously Indicated That They Were Not Contracts

1.  <u>Contractual Formation</u>

Maryland employs "the objective interpretation of contracts."  *See Cochran v. Norkunas*, 919 A.2d 700, 709 (Md. 2007).  When a contract is unambiguous, it is interpreted according to its plain meaning without regard to "what the parties may have subjectively intended by certain terms at the time of formation."  *Id.*  Parol evidence may be employed only to "contravene the legal existence of a contract."  *Id.* at n.6.  Although the court may consider "the intentions of the parties at the time of the execution of the contract" to aid in interpreting an ambiguous contract, a court must resolve any ambiguities against the drafter.  *John L. Mattingly Constr. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 999 A.2d 1066, 1074 (2010).

2.  <u>The Handbook, Acknowledgment, and Included Attached Policy, are Not Contracts</u>

The Handbook Policy, the Acknowledgment, and the Attached Policy (all of which, according to Ms. Nancy Delach, Ms. Brent signed simultaneously when she allegedly[2] electronically signed "the Company Policy and Employee Handbook (including accompanying Dispute Resolution via Arbitration Policy)") do not create an enforceable agreement to arbitrate for the simple reason that Priority 1 has unambiguously indicated that these documents are not contracts.  The Fourth Circuit recently affirmed a district court decision refusing to enforce an arbitration agreement based on a disclaimer of contractual intent.  In *Lorenzo v. Prime Communs., L.P.*, the defendant moved to

---

[2] *See* footnote 1.

compel arbitration based on an arbitration policy contained in its employee handbook.  Nos. 14-1622, 14-1727, 2015 U.S. App. LEXIS 20400 (4th Cir. Nov. 24, 2015) ("*Lorenzo*").  In support of its motion, the defendant argued that an enforceable agreement to arbitrate was created when the plaintiff received the handbook which contained the arbitration policy and continued to work for the defendant.  *Id.* at *7.  In response, the plaintiff argued that there was no enforceable agreement to arbitrate because the acknowledgment form specifically stated that "no provision [of the handbook] should be construed to create any bindery [sic] promises or contractual obligations" and "the information contained in the [h]andbook…are in no way to be interpreted as a contract."  The federal district court for the Eastern District of North Carolina refused to compel arbitration.  *See Lorenzo v. Prime Communs., L.P.*, No. 5:12-cv-69-H, 2013 U.S. Dist. LEXIS 165062, 2013 WL 6116846 (E.D.N.C. Nov. 20, 2013).

The Fourth Circuit, with Judge Niemeyer writing for the panel, affirmed the district court's refusal to compel arbitration.  In so doing, the Court explained that "[a]ny <u>implied</u> assent that might have been created by Lorenzo's receipt and review of the Handbook and by her continued employment was nullified by the <u>express</u> agreement of the parties not to be bound by any of the Handbook's terms."  *Lorenzo*, 2015 U.S. App. LEXIS 20400 at *10 (emphasis in original).  This holding, based on North Carolina commonlaw, was based on the basic principle that an implied agreement is superseded by an express agreement on the same subject matter.  *See Corpus Juris Secundum*, 17 CJS Contracts § 7 (2013) ("An implied agreement is precluded only where the express and the asserted implied contract relate to the same subject matter and where the provisions of the express contract would supersede those of the other. An implied agreement may be given effect where it is based on the subsequent conduct of the parties not covered by the express contract." (footnotes omitted)).  The Maryland commonlaw of contracts is no different.

16

The Handbook expressly disclaims contractual effect. Page 2 of the Handbook states: "[t]he policies contained in this Handbook do not create any contract of employment, nor do they constitute the terms of an implied agreement with the Company." *See* Handbook, Ex. B, JR Bates No. 7. This disclaimer is reiterated in the Acknowledgment, which states that:

> [T]his **Company Policy and Employee Handbook** constitutes management guidelines only and is neither to be interpreted as a contract between **Priority 1 A.G., nor its dealerships** and me, nor does it constitutes a guarantee that my employment will continue for any specified period of time…neither this Handbook nor any other communication by a management representative is in any way intended to create an express or implied contract of employment.

*See* Acknowledgment, Ex. C, JR Bates No. 100 (emphasis in original). This language renders both Arbitration Policies unenforceable.

The language of the Acknowledgment is strikingly similar to that contained in the acknowledgment which the *Lorenzo* court held "nullified" any implied agreement to arbitrate. The acknowledgment in *Lorenzo* stated "I understand that the information contained in the Handbook are guidelines only and are in no way to be interpreted as a contract." *Lorenzo*, 2015 U.S. App. LEXIS 20400 at *10. Here, the Acknowledgment states that the Handbook "constitutes management guidelines only" and "is [not] to be interpreted as a contract between [Priority 1] and [Ms. Brent]…". Acknowledgment, Bates No. 100. Similarly, the acknowledgment in *Lorenzo* states that "no provision should be construed to create any [binding] promises or contractual obligations" while the Acknowledgment here states "neither this Handbook nor any other communication by management is in any way intended to create an express or implied contract of employment." *See Lorenzo*, 2015 U.S. App. LEXIS 20400 at *10; Acknowledgment, Bates No. 100.

Priority 1 cannot pick and choose which portions of the Handbook and Acknowledgment are binding. This is especially true where, as here, both the Handbook and the Acknowledgment contain blanket disclaimers that the Handbook or Acknowledgment are contractual in nature.

17

Indeed, it is worth noting that the Acknowledgment refers to "this…handbook" in particular as non-binding.  *See* Acknowledgment at Bates No. 100.  Just as in *Lorenzo*, "the acknowledgment form at issue here did not exempt the [Handbook's] arbitration provision from the acknowledgment's explicit statements disclaiming that the Handbook established any binding obligations." *Lorenzo*, 2015 U.S. App. LEXIS 20400 at *8.  As such, the contractual disclaimer renders the Handbook Policy and the Attached Policy unenforceable. *See Lorenzo*, 2015 U.S. App. LEXIS 20400 at *10; *see also*, *e.g.*, *Hergenreder v. Bickford Senior Living Group, LLC*, 656 F.3d 411 (6th Cir. 2011) (no agreement to arbitrate where handbook specifically stated that it was not a contract); *Ex parte Beasley*, 712 So. 2d 338, 340-41 (Ala. 1998) (instructing the lower court to vacate its order to compel arbitration pursuant to an arbitration agreement contained in an employee handbook where the handbook contained a disclaimer indicating that "no written statement or agreement in this handbook is binding" and where the agreement to arbitrate was contained in the handbook, not in the employee acknowledgement form); *Stewart v. Fairlane Community Mental Health Ctr.*, 571 N.W. 2d 542 (Mich. App. 1997) (holding that an arbitration provision in a handbook was unenforceable where it explicitly stated it was neither an employment agreement nor a contract of employment).

**d.  The Maryland Uniform Electronic Transactions Act**

1.  The Maryland Uniform Electronic Transactions Act Provides That Electronic Signatures Are Only Valid When The Parties Have Agreed to Conduct Transactions By Electronic Means

Any electronic signature from Ms. Brent is not binding because Ms. Brent never agreed to conduct transactions by electronic means.  Like many other states, Maryland has adopted a version of the Uniform Electronic Transactions Act.  *See* The Maryland Uniform Electronic Transactions Act, Md. Commercial Law Code Ann. § 21-101 *et seq.* (the "MUETA").  Section 104 of the MUETA governs when electronic signatures may be used.  In particular, Section 104(b) provides that "this title applies only to transactions between parties, each of which has agreed to conduct transactions

by electronic means." MUETA, § 21-104(b)(1). The MUETA provides three principal methods by which a party may agree to conduct electronic transactions:

1) By entering into a "separate and optional agreement the primary purpose of which is to authorize a transaction to be conducted by electronic means", *see* MUETA, § 21-104(b)(3);

2) By agreeing to a provision in a larger contract which authorizes a transaction to be conducted by electronic means if that provision is "conspicuously displayed and separately consented to." *Id.*

3) "From the context and surrounding circumstances, including the parties' conduct", *see* MUETA § 21-104(b)(2).

The requirements of subsection 104(b) of the MUETA cannot be varied by agreement. *See* MUETA, § 21-104(b)(5). Finally, separate consent must be obtained for each agreement entered into electronically. MUETA, § 21-104(c)(1) ("A party that agrees to conduct a transaction by electronic means may refuse to conduct other transactions by electronic means.").

**2.** **Any Electronic Signature Made by Ms. Brent Is Invalid Because She Did Not Agree to Conduct Transactions By Electronic Means**

Any electronic signature by Ms. Brent is invalid because Ms. Brent did not agree to conduct transactions by electronic means[3]. In the affidavit filed with this Court on October 20, 2014, Ms. Nancy Delach, Defendant's Human Resources Manager described the process which its employees used to electronically sign documents. *See* Delach Aff. at Ex. F, JR Bates Nos. 104 to 105. It is undisputed that this process, as described by Ms. Delach, did not include the execution, either physically or electronically, of either a "separate and optional agreement the primary purpose of which is to authorize a transaction to be conducted by electronic means" or any other

---

[3] *See* footnote 1.

"conspicuously displayed and separately consented to" provision in which Ms. Brent consented to conduct transactions by electronic means.  *See* MUETA, § 21-104(b)(3).

> 3.  The Circumstances Surrounding Ms. Brent's Alleged Electronic Signature Do Not Support An Inference That She Agreed to Conduct Transactions By Electronic Means

The conduct of the parties in this case indicated that the signature required on the Acknowledgment was a physical signature.  In *Powell v. City of Newton*, the Supreme Court of North Carolina interpreted North Carolina's version of the Uniform Electronic Transactions Act, which has a provision identical to MUETA § 21-104(b)(1).  *See* N.C.G.S. § 66-311, 66-315(b); *Powell v. City of Newton*, 703 S.E.2d 723, 727-28 (N.C. 2010) ("[T]he provisions of [the Act] apply only to 'transactions between parties each of which has agreed to conduct transactions by electronic means. Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct.").  In *Powell*, the Court found that while the parties used electronic means to exchange documents, "their conduct indicated an understanding that the signature required by the statute of frauds for this conveyance of land would be plaintiff's physical signature."  *Id.* at 728.  The Court based this finding on a communication from the City to the plaintiff requesting that it be provided with copies of physically executed documents. *Id.*  The Minnesota Court of Appeals reached a similar conclusion in *SN4, LLC v. Anchor Bank, FSB*, again interpreting a version of the Uniform Electronic Transactions Act which is substantially identical to the MUETA.  848 N.W.2d 559, 566 (Minn. Ct. App. 2014) (interpreting Minnesota's version of the Uniform Electronic Transactions Act, Minn. Stat. § 325L.06).  In *SN4*, after noting that "there was no express agreement…to electronically subscribe to the purported agreement" the Court held that "their conduct does not evidence an implied agreement to do so."  *Id.* at 567.  Like the *Powell* court, the court in *SN4* emphasized the request of the parties for "fully executed" or "hard copies" of the documents in determining that they had not agreed to conduct the transaction

electronically. *Id.* The Court further opined that "while contracting parties may agree to negotiate and form a contract by electronic means, doing so does not mean that they have also agreed to electronically subscribe to whatever agreement may result from their electronic negotiations." *Id.* at 567 (applying Minn. Stat. § 325L.05(b), which is substantively identical to MUETA, § 21-104(c)(1)).

Here, as in *Powell* and *SN4*, the parties' conduct reveals an intention to conduct the instant transaction via physical signature because Priority 1 requested that Ms. Brent physically sign the Acknowledgment and provide Priority 1 with a copy. This understanding is reflected in the memorandum from Mr. Louis Cohen. *See* Cohen Memo, Ex. A, JR Bates No. 1. In this memorandum, Mr. Cohen states that "THERE ARE (2) COPIES OF EACH OF THREE (3) ACKNOWLEDGMENT FORMS IN THE BACK OF EACH BOOK. <u>ONE COPY OF EACH IS TO BE SIGNED BY YOU AND TURNED INTO [sic] YOUR MANAGER FOR FORWARDING TO THE OFFICE NO LATER THAN FRIDAY NOVEMBER 11, 2011.</u>" *See* Cohen Memo, Ex. A, JR Bates No. 1 (emphasis in original).

**e. No Meeting of the Minds**

    **1.** <u>There Was No Meeting of the Minds on Material Terms of any Purported Agreement to Arbitrate</u>

There is no meeting of the minds on the material terms of the arbitration process, including the identity of the arbitrator and the rules to be employed, and even the nature of the disputes which are subject to arbitration. Previously, Defendants argued in motions before this Court that the Handbook Policy and Attached Policy collectively constituted the "Arbitration Agreement". *See* Memorandum of Points and Authorities in Support of Defs. Motion to Dismiss and Compel Arbitration, p. 3 (Aug. 14, 2014) (ECF No. 6-1) (Stating that the "Arbitration Agreement provides [as follows]" and quoting both the Handbook Policy and the Attached Policy); Delach Aff. at Ex. F, JR Bates No. 106, 109, 110 (referencing the Attached Policy and Handbook Policy as "collectively" constituting the Arbitration Agreement). Even if they now argue that the Attached Policy only, not

the Handbook Policy, constitutes the entirety of the arbitration agreement at issue, that document is unenforceable because it omits material terms.

The Attached Policy contains no reference to the rules to be used in arbitration. Similarly, the Attached Policy provides that "[e]ither side may request that the dispute be submitted for arbitration to the Maryland state board of mediation with the request that a staff member be appointed to act as arbitrator." *See* Attached Policy at Bates No. 000101.

No meeting of the minds, and therefore no contract, can exist in the presence of ambiguous. As the Maryland Court of Appeals has explained:

> [N]o action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain in its essential terms. The parties must express themselves in such terms that it can be ascertained to a reasonable of degree of certainty what they mean. If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties. Such a contract cannot be enforced in equity nor sued upon in law. For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties.

*Robinson v. Gardiner*, 196 Md. 213, 217, 76 A.2d 354 (Md. 1950) (internal citations omitted); *see also Kennedy v. MidAtlantic, LLC*, No. JKB-15-0346, 2015 U.S. Dist. LEXIS 145923 at *16 (D. Md. Oct. 28, 2015) (arbitration agreement was unenforceable, in part, because there was no "meeting of the minds" between employee and employer as to the nature of the document signed by employee).

In *Kennedy*, Judge Bredar held that an arbitration agreement is unenforceable when the defendant cannot demonstrate that there was a "meeting of the minds" as to its terms. No. JKB-15-0346, 2015 U.S. Dist. LEXIS 145923 at *16 (D. Md. Oct. 28, 2015). In *Kennedy*, the plaintiff-employee argued that he had signed an arbitration agreement in the course of providing "biographical information" to his current employer, while the defendant-employer argued that it had been signed as part of the employee's application for employment. *Id.* Judge Bredar reasoned that,

in the absence of an agreement on material terms (in *Kennedy*, whether the plaintiff was continuing in, or applying for, a position with the defendant; here, the identity of the arbitrator, rules of the arbitration, and scope of the disputes subject to arbitration), there was no enforceable agreement to arbitration. *Id.*

The Defendants drafted these documents and so, these types of ambiguities must be construed against them. *John L. Mattingly Constr. Co. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327, 999 A.2d 1066 (Md. 2010) (holding that "a contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person", and "it is a basic principle of contract law that, in construing the language of a contract, ambiguities are resolved against the draftsman of the instrument") (internal quotation marks and citations omitted).  In *Kennedy v. ADF MidAtlantic, LLC*, the federal district court for the District of Maryland expressly held that ambiguities in arbitration agreements should be "construed against the drafter of the document[.]"  No. JKB-15-0346, 2015 U.S. Dist. LEXIS 145923 at *16 (D. Md. Oct. 28, 2015).

>   2.   There Was No Meeting of the Minds As to the Effect of the Offer of Employment
>        Confirmation

Defendant nowhere contends, and there is no record evidence to support, that Ms. Brent physically signed the Acknowledgment or the Attached Policy.  In addition to claiming that Ms. Brent electronically signed the Acknowledgment and Attached Policy[4], Defendant asserts Ms. Brent is bound by the Handbook (and the Handbook Policy) because, on or about March 1, 2012, Ms. Brent signed a document entitled "Offer of Employment Confirmation" (the "Confirmation").  *See* Delach Aff. Ex. F, JR Bates No. 108; Defendant's Reply In Support of Defendant's Motion to Dismiss and Compel Arbitration (the "MTD Reply") at pp. 1-2 (Oct. 10, 2014) (ECF No. 15). Defendants' argue that the Confirmation indicates that Ms. Brent "entered into an agreement with

---

[4] *See* footnote 1.

Defendant…that the terms of her employment with Defendant were subject to the policies and provisions contained in Defendant's standard employee information handbook[.]" *Id.*

The Confirmation does not evidence that Ms. Brent intended to be bound by the Handbook for two reasons: 1) As is described above, the Handbook is not a contract; and 2) the Confirmation does not indicate that Ms. Brent intended to be bound by the Handbook. The document entitled "Offer of Employment Confirmation," which is attached as Exhibit A to Defendants' Motion, Doc. 6-2 at p. 4 (the "Employment Offer"), states , in relevant part, as follows:

> <u>Compensation</u>: See attached standard BMW of Rockville Client Advisor Compensation Plan.
> <u>Terms of Employment</u>: Subject to company policies and provisions contained in standard employee information handbook. Each employee's compensation plan is deemed as a confidential matter. Under no circumstances is it to be discussed or shared with fellow employees other than direct managers or senior management of the company. Violation of this policy can cause dissatisfaction or effect the morale of other employees and in turn effect an individual's productivity. A violation of this policy is against company policy and as such may result in actions by the company that could include termination of employment.[5]

*See* Exhibit A to Delach Aff. at Ex. F, JR Bates No. 108. The only mention of the Handbook is the sentence fragment which begins the "terms of employment" section, and

---

[5] It is worth noting that the Confirmation is unlawful on its face. Its prohibition on Defendants' employees discussing their compensation with their coworkers is a *per se* violation of Section 7 the National Labor Relations Act ("NLRA"), 29 U.S.C. § 157, which provides employees with the right to make efforts to organize and discuss the terms of their employment, which can include salary and benefits information. *See, e.g., Ambriola Co. v. Unnamed Charging Party*, No. 22-CA-061632 (NLRB 2011) (finding that an employer violated the NLRA by prohibiting an employee from discussing his wages with co-workers, and for firing the employee for violating that policy) (information about the above case available here: http://www.nlrb.gov/west-caldwell-new-jersey); *Double Eagle Hotel & Casino*, 341 N.L.R.B. 112 (2004), *enforced at* 414 F.3d 1249 (10th Cir. 2005), *cert. denied*, 546 U.S. 1170 (2006) (finding that an employer could limit employee discussions of working conditions, including pay issues, in areas frequented by customers, but could not impose a complete ban on such discussions without violating the NLRA); *Custom Cut, Inc. v. Sw. Reg'l Council of Carpenters, United Bhd. Of Carpenters & Joiners of America*, Case 28 CA-18062 (NLRB Sept. 11, 2003), opinion available here: file:///C:/Users/LawClerk/Downloads/340_17.pdf.pdf (violation of the NLRA by prohibiting discussion of wages).

states "Subject to company policies and provisions contained in standard employee handbook." *Id.* (this sentence fragment being the "Clause") The Clause lacks an object telling us what is subject to the terms of the Handbook.

In context, the Clause reads as part of the subsequent sentence. The primary subject of the Confirmation is employee compensation. The Confirmation indicates that the "standard BMW of Rockville Client Advisor Compensation Plan" is attached, but does not state that the Handbook is attached. When the Clause is read together with the subsequent sentence, substituting a comma for a period, it forms part of a coherent whole which is contiguous with the Confirmation's overall purpose: "Subject to company policies and provisions contained in standard employee information handbook[,] [e]ach employee's compensation plan is deemed as a confidential matter."

To the extent that the language of the Confirmation is ambiguous, that ambiguity must be interpreted against Defendants, who drafted the Confirmation. In *Kennedy v. MidAtlantic, LLC,* Judge Bredar refused to enforce an arbitration agreement based, in part, on uncertainty "as to the identity of the parties to the agreement." No. JKB-15-0346, 2015 U.S. Dist. LEXIS 145923 at *15 (D. Md. Oct. 28, 2015). While finding that "a plain reading of the document" supported its reading, the Court noted that even had the agreement been ambiguous, "any ambiguity is construed against the drafter of the document – not [the plaintiff]." *Id.*

## V.   CONCLUSION

WHEREFORE, Ms. Brent respectfully prays that this Motion for Summary Judgment be GRANTED, and that the accompanying Proposed Order be entered.

Date: December 14, 2015

Respectfully submitted,

___/S/_____

Robert B. Fitzpatrick, Esq.
ROBERT B. FITZPATRICK, PLLC
1825 Connecticut Avenue, N.W., Suite 640
Washington, D.C. 20009-5728
(202) 588-5300 (phone)
(202) 588-5023 (fax)
fitzpatrick.law@verizon.net (email)