IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

| | |
|---|---|
| Debra J. Brent, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Civil Action No. 8:14-cv-001705-PWG** |
| ) | |
| Priority 1 Automotive Group, Inc., *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Plaintiff, Ms. Debra J. Brent (hereafter, "Plaintiff" or "Ms. Brent"), through her undersigned counsel, hereby respectfully submits this Reply to Defendant's Response in Opposition to Ms. Brent's Motion for Summary Judgment[1].   The undisputed facts, including the sworn affidavits of P1's Human Resources Manager and the Statement of Material Facts Which Plaintiff Contends are not in Genuine Dispute (ECF No. 64-3), preclude Defendant Priority 1 Automotive Group, Inc. ("P1") from compelling arbitration.  Ms. Brent respectfully requests that the Court grant the Motion and enter the Proposed Order that was attached thereto (ECF No. 64-4).

I.    **INTRODUCTION**

Plaintiff is entitled to summary judgment because: 1) she did not consent to engage in transactions by electronic means; 2) the Arbitration Policy[2] is unenforceable for want of

---

[1] Plaintiff's Motion for Summary Judgment (Dec. 14, 2015) (ECF No. 64) is referred to herein as the "Motion"; the Memorandum in Support of the Motion (Dec. 14, 2015)( ECF No. 64-1) is referred to herein as the "Memorandum"; and P1's Response in Opposition (Jan. 15, 2016) (ECF No. 65) is referred to herein as the "Opposition".  The instant brief is referred to as the "Reply".

[2] The "Arbitration Policy" as used herein, refers collectively, to the "Binding Arbitration Program" on page 28 of P1's Company Policy and Employee Handbook (**Exhibit B** at p. 28, JR Appx. Bates No. 33) (the "Handbook Policy") and to the document contained in the Joint Record at **Exhibit D**, JR Appx. Bates No. 101 (the "Attached Policy").

consideration; and 3)  the named arbitration provider never existed.  P1 largely concedes each of these points.

Ms. Brent's alleged electronic signature is invalid because she never consented to engage in transactions via electronic means.  P1's only response is that the "context and circumstances", i.e. the fact that P1's standard form electronic signature process requested an electronic signature and Ms. Brent's alleged use of same, is sufficient to infer that Ms. Brent consented to engage in transactions via electronic means.  This conclusion is contrary to the plain text of the MUETA, which contains specific criteria which standard forms must meet to constitute, in and of themselves, consent to engage in transactions via electronic means.  P1 does not even attempt to argue that the standard form language upon which it relies meets these standards.

The Arbitration Policy lacks consideration.  The sworn affidavit of P1's Human Resources Manager, Ms. Nancy Delach ("Ms. Delach"), states that the Arbitration Policy was part of P1's Company Policy and Employee Handbook (**Exhibit B**, JR[3] Appx. Bates Nos. 2 to 99) (the "Handbook"), which contained a unilateral modification clause.  As such, P1  had the power to unilaterally modify the Arbitration Policy.

Finally, the Arbitration Policy fails because the arbitration provider identified therein never existed.  Although P1 correctly notes that a Court may sometimes name an arbitrator pursuant to Section 5 of the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, the Court may not do so if the arbitrator selected is integral to the agreement.

## II.   STANDARD OF REVIEW

### a.  Summary Judgment

Ms. Brent is entitled to Summary Judgment because "there is no genuine dispute as to any material fact and [Plaintiff] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A

---

[3] The Joint Record is referred to herein as the "JR".

material fact is a fact that could "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  P1 correctly notes that it cannot defeat summary judgment if its evidence is "merely colorable, or is not significantly probative[.]"  Opposition at p. 2; *quoting Liberty Lobby*, 477 U.S. at 249-50.  P1 also correctly explains that it "cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *See* Opposition at p. 2; *quoting Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001).  It is well-established that P1 cannot create a genuine dispute of material fact through the unsworn *ipse dixit* in its brief.  *Felty v. Graves-Humphreys Co.*, 785 F.2d 516, 521 (4th Cir. 1986) (*quoting Estrella v. Brandt*, 682 F.2d 814, 819-20 (9th Cir. 1982) ("Legal memoranda…are not evidence and do not create issues of fact capable of defeating [summary judgment].")).

### b. Interpretation of the So-Called Arbitration Policy

No presumption in favor of arbitration applies to disputes, such as this, which concern whether an agreement to arbitrate exists.  P1's boilerplate recitation that arbitration is "favored" ignores the 10th Circuit's observation that "before the [Federal Arbitration] Act's heavy hand in favor of arbitration swings into play, the parties themselves must agree to have their disputes arbitrated." *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014).  In other words, "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Applied Energetics, Inc. v. NewOak Capitall Mkts., L.L.C.*, 645 F.3d 522, 526 (2d Cir. 2011).

## III.   MS. BRENT DID NOT CONSENT TO CONDUCT TRANSACTIONS BY ELECTRONIC MEANS

The Maryland Electronic Transactions Act permits the use of electronic signatures "only to transactions between parties, each of which has agreed to conduct transactions by electronic means."  Md. Comm. Law Code Ann. § 21-104(b)(1) (the "MUETA").  P1 admits, as it must, that

"Ms. Brent did not execute a separate and distinct agreement whereby Ms. Brent agreed to conduct the subject transaction by way of electronic means." Opposition at p.9. Furthermore, P1 does not contend, nor could it, that its standard form electronic signature process meets the requirements of MUETA § 21-104(b)(3). P1's sole argument is that, despite these failings, there is a dispute as to whether the "context and circumstances surrounding the transaction" indicate that Ms. Brent agreed to conduct the subject transaction by electronic means. *Id.* at p. 9; MUETA § 21-104(b)(2).

There is no genuine dispute over this issue for two reasons: 1) the language relied on by P1 provides that Ms. Brent *received* the Arbitration Policy, not that she agreed to be bound by it; and 2) the only facts identified by P1 are incapable, as a matter of law, of establishing that Ms. Brent agreed to conduct the transaction by electronic means.

### a. Ms. Brent Did Not Consent to Conduct Transactions Via Electronic Mmeans

1. At Most, Ms. Brent Acknowledged Receipt of, not Agreement to, The Arbitration Policy

Summary judgment is appropriate because P1 does not identify any "context" or "circumstances" which support its contention that Ms. Brent agreed to conduct the subject transaction by electronic means. P1's argument on this point hinges entirely on two notices allegedly[4] provided to Ms. Brent during the course of her alleged[5] electronic review and signature acknowledging receipt of the documents in question. The first notice allegedly stated:

> **E-Signature Requirement**. Your E-Signature is Required. Please click the ESignature icon to proceed. By completing the e-signature you are agreeing to Receipt of the Priority 1 Automotive Group Company Policy and Employee Handbook; Dispute Resolution via Arbitration Policy; Consent to Obtain Consumer Report Disclosure; Employee Acknowledgement and Agreement to Comply with Information Security Program; Acknowledgement of policies pertaining to Motor Vehicle Operating; and, Acknowledgement of the Internet Usage Policy.

---

[4] For the purposes of the instant Motion **only**, Plaintiff does not contest P1's description of the e-signature process allegedly navigated by Ms. Brent.

[5] For the purposes of the instant Motion **only**, Plaintiff does not contest P1's assertion that Ms. Brent provided her electronic signature as it asserts.

*See* Affidavit of N. Delach, **Exhibit F**, JR Appx. Bates No. 104-105 (the "Delach Aff.").  The second notice allegedly stated:

> **Electronic Signature** [—] YOUR ELECTRONIC SIGNATURE DOCUMENTS [—] Please click on the document link(s) below to open the document(s) you are required to electronically sign. After you have opened the document, you can electronically sign it by clicking the e-sign button.

*Id.*

P1's argument is unavailing.  Simply put, Ms. Brent's acknowledgment of *receipt* does not indicate her *agreement* to be bound.  The language cited by P1 provides only that "[b]y completing the e-signature you are agreeing to **receipt** of the [items listed]."  Delach Aff., **Exhibit F**, JR Appx. Bates No. 104-105 (emphasis added).  This stands in stark contrast to the facts of *Cortez v. Ross Dress for Less, Inc.*, the sole case cited by P1 for the proposition that Ms. Brent consented to conduct transactions by electronic means.  *See* Case No. EDCV 13-01298 DDP (DTBx), 2014 U.S. Dist. LEXIS 50569, 2014 WL 1401869 (C.D. Cal. April 10, 2014).  In *Cortez* "the software…made explicitly clear, in understandable language, both before and after presenting the text of the [Dispute Resolution Agreement], that by clicking 'I agree,' the employees were **entering into a binding agreement** that disputes arising from their employment would be resolved by arbitration."  *Id.* at *2 (emphasis added).  Unlike the language relied upon here, the electronic signature process in *Cortez* included language which specifically notified the employee that "[b]y agreeing to [the document] you and [Defendant] are waiving your right to have disputes related to your employment heard by a jury [and] are agreeing to have any dispute[s] decided by an arbitrator instead."  *Id.* at *10 n.1.  P1's assertions that Ms. Brent's signature evidences both her "receipt" and her "agreement" are without basis in the record.  *See* Opposition at p. 6-7, 7, 8, 11, 12.  Mere acknowledgment of receipt does not indicate that Ms. Brent agreed to be bound.

## 2.  P1's Allegations Cannot, as a Matter of Law, Constitute Consent Under the MUETA

The allegations relied on by P1 are insufficient, as a matter of law, to demonstrate Ms. Brent's consent to conduct transactions by electronic means.  Under the MUETA, a standard form can serve as stand-alone evidence that a party agreed to conduct a transaction by electronic means only if it is: 1) "conspicuously displayed"; and 2) "separately consented to".  § 21-104(b)(3).  P1 concedes, as it must, that "Ms. Brent did not execute a separate and distinct agreement whereby Ms. Brent agreed to conduct the subject transaction by way of electronic means."  Opposition at p. 9.  Nor does P1 argue that its e-signature process otherwise meets the requirements of § 21-104(b)(3).  As such, P1 must show, under § 21-104(b)(2) that the "context and surrounding circumstances" evidence Ms. Brent's intent to conduct the instant transaction via electronic means.  *See* MUETA § 21-104(b)(2) ("[w]hether the parties have agreed to conduct a transaction by electronic means is determined from the context and surrounding circumstances[.]").

P1's argument fails to establish that Ms. Brent intended to conduct the instant transaction via electronic means.  In its attempt to do so, P1 relies entirely on the text of its standard form e-signature process.  P1 wisely does not attempt to argue that its standard form e-signature process meets the requirements in § 21-104(b)(3) of the MUETA.  If P1's argument – that a standard form that is concededly inadequate under § 21-104(b)(3) can nevertheless meet the requirements of § 21-104(b)(2) – were adopted, it would render § 21-104(b)(3) superfluous. *See Witt v. United Cos. Lending Corp.*, 113 F.3d 508, 512 (4th Cir. 1997) (noting that "courts should disfavor interpretations of statutes that render language superfluous") (*quoting Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992)).

The interpretive notes cited by P1 are irrelevant to the issue at hand.  The notes are to the uniform legislation, not the version enacted by the Maryland Legislature.  Although § 5 of the Uniform Electronic Transactions Act (the "UETA") is identical to MUETA § 21-104(b)(2), the

UETA lacks any parallel to MUETA § 21-104(b)(3).  *See* Uniform Electronic Transactions Act § 5 (the "UETA") (available at: http://www.uniformlaws.org/shared/docs/electronic%20transactions/ueta_final_99.pdf).  This suggests that the Maryland Legislature viewed consent more narrowly than suggested by the UETA.  Even if the comments were applicable, they merely indicate that the parties' words and actions should be "broadly construed" (i.e. that all potential "words" and "actions", broadly construed, should be considered) – not that they should be construed in favor of finding consent.  *Id.* at comment 4.

Finally, the sole decision cited by P1 in support of its position, *Cortez v. Ross Dress for Less, Inc.*, is inapposite.  *See* Case No. EDCV 13-01298 DDP (DTBx), 2014 U.S. Dist. LEXIS 50569, 2014 WL 1401869 (C.D. Cal. April 10, 2014).  *Cortez* dealt with the California Uniform Electronic Transactions Act, which contains a key difference from the MUETA.  *See* Cal. Civ. Code § 1633.5 (the "CUETA").  Like the MUETA, the CUETA indicates that "an agreement to conduct a transaction by electronic means may not be contained in a standard form contract" unless the standard form meets certain requirements.  *Compare* MUETA § 21-104(b)(3) with CUETA § 1633.5(b).  Crucially, however, the CUETA provides that these requirements apply only if the standard form contract is "not an electronic record".  *See* CUETA § 1633.5(b).  The MUETA provides no similar exemption from its requirements for electronic records.  *See* MUETA § 21-104(b)(3).  Thus, the court in *Cortez*, which addressed an electronic document, did not have to decide whether a concededly inadequate form could nonetheless provide sufficient "context and circumstances" to evidence consent.

## IV.   THE ALLEGED ARBITRATION POLICY LACKS CONSIDERATION

### a.   P1 Concedes That the Arbitration Policy is not Binding if it Can be Unilaterally Modified

P1 concedes that an agreement to arbitrate is invalid if not supported by adequate consideration.  Opposition at p. 15 *citing Cheek v. United Healthare of Mid-Atl., Inc.*, 378 Md. 139, 147,

835 A.2d 656, 661 (2003).  The only consideration cited by P1 in the Opposition is its allegedly

mutual promise to arbitrate disputes.  *Id.* at p. 16.  P1 does not dispute that its allegedly mutual

promise to arbitrate would be illusory if it could unilaterally modify it.  Similarly, P1 does not dispute

that pages 2 and 89 of its Handbook, as well as the Acknowledgment of Receipt, both provide P1

with the ability to unilaterally modify the Handbook.  **Exhibit B** at p. 2, 89, **Exhibit C**, JR Appx.

Bates No. 7, 94, 100.  If P1 could unilaterally modify the Arbitration Policy, as it could all its other

policies, then the Arbitration Policy lacked consideration.

    **b. Because it was Part of the Handbook, the Arbitration Policy Lacks Consideration**

        P1 has admitted that its Arbitration Policy was part of its Handbook.  First, the Arbitration

Policy is part of the Handbook because it is *actually contained in P1's Handbook*.  Page 28 of the

Handbook contains a provision entitled "Binding Arbitration Program".  *See* Handbook, **Exhibit B**,

JR Appx. Bates No. 33 (the "Handbook Policy").  P1 attempts to elide this undisputed fact in the

Opposition by focusing solely on what Ms. Delach referred to as the "dispute resolution via

arbitration policy acknowledgment." (the "Attached Policy").  *See* Delach Aff., **Exhibit F** at par. 5,

JR Appx. Bates No. 104 (referencing **Exhibit D**, JR Appx. Bates No. 101).

        The "Attached Policy" and the "Handbook Policy" collectively constituted a single

Arbitration Policy which was part of the Handbook.  The Motion to Compel and the two sworn

affidavits signed by Ms. Delach all refer to the Handbook Policy and the Attached Policy,

**collectively**, as the "Arbitration Agreement".  *See* Memorandum of Points and Authorities in

Support of Defendant's Motion to Dismiss Complaint and to Compel Arbitration at pp. 1, 3, 4, 4

n.6, 12, and 13 (Aug. 14, 2014) (ECF No. 6-1) (the "Motion to Compel") (for example page 12

quotes language from the Handbook and refers to it as the "Arbitration Agreement"); Affidavit of

N. Delach at p. 2 (Aug. 14, 2014) (ECF No. 6-2); Affidavit of N. Delach at p. 4 (Oct. 20, 2014)

(ECF No. 15-1) (same).

Ms. Delach's October 20, 2014 affidavit attached both the Handbook Policy and the

Attached Policy, and referred to these documents, collectively, as the "Arbitration Agreement." *See*

Delach Aff. at Ex. F par. 7, JR Bates No. 106, 109-110.  Ms. Delach further stated that "**The**

**Company Policy and Employee Handbook contained provisions for binding arbitration**

(collectively, "Arbitration Agreement")[.]" *Id.*  Ms. Delach further opined that the Attached Policy

was "included at the end of the Company Policy and Employee Handbook." *Id.* at par. 7, JR Bates

No. 106.

Finally, P1 relied on the assertion that the Arbitration Policy was part of the Handbook in its

Motion to Compel.  In that document, P1 asserted that the "Company Policy and Employee

Handbook contained arbitration provisions whereby Plaintiff and Defendant agreed that all

differences or disputes related to Plaintiff's employment with Defendant, shall be submitted to

binding arbitration ('Arbitration Agreement')." *See* Motion to Compel at p. 3 (Aug. 14, 2014) (ECF

No. 6-1).  Later, P1 argued that Ms. Brent had agreed to be bound by the Arbitration Policy by

signing an "Offer of Employment Confirmation" (*see* **Exhibit F** at Ex. A, JR Appx. Bates No. 108)

which stated that her employment was "subject to the policies and provisions contained in [the

Handbook][.]" Motion to Compel at p. 4 (Aug. 14, 2014) (ECF No. 6-1).  The Motion to Compel

also relied on Ms. Brent's "receipt of the [Handbook]." *Id.*

The two allegations relied on by P1 do not create a genuine issue of material fact as to

whether the Arbitration Policy was part of the Handbook.  The two allegations relied on by P1 to

attempt to create a genuine dispute of material fact are: 1) that text displayed by the e-signature

software allegedly enumerated the Handbook and the Arbitration Policy separately; and 2) that

Handbook and Arbitration Policy were "expressly delineated" in some un-described manner despite

being presented to Ms. Brent as a single .pdf document.  *See* Opposition at p. 14.

It is worth noting that the text in numbered item 1, above, was quoted by Ms. Delach only *two paragraphs* before her sworn statement that the provisions for binding arbitration were contained and included in the Handbook.  As to numbered item 2, it is noteworthy that the e-signature log provided by P1 records only a single signature.  *See* **Exhibit F** at Ex. C, JR Appx. Bates No. 111.

To review, the Motion to Compel repeatedly refers to the Arbitration Policy as being "contained" in the Handbook, as does Ms. Delach in her two sworn statements.  *See* Motion to Compel at pp. 1, 3, 4, 4 n.6, 12, and 13 (Aug. 14, 2014) (ECF No. 6-1); Affidavit of N. Delach at p. 2 (Aug. 14, 2014) (ECF No. 6-2); Affidavit of N. Delach at p. 4 (Oct. 20, 2014) (ECF No. 15-1). Indeed, the Handbook concededly *does* contain an arbitration policy, on page 28, which is titled "Binding Arbitration Program".  *See* **Exhibit B**, JR Appx. Bates No. 33.  P1 relied heavily on the this fact in its Motion to Compel.  *See* Motion to Compel at p. 12.  P1 admits that the Handbook and allegedly "stand-alone" Arbitration Policy were presented to Ms. Brent as "one PDF document[.]"  *See* Opposition at p. 13.  The log file provided by P1, allegedly representing Ms. Brent's e-signature of both the Handbook and "stand-alone" Arbitration Policy recorded a single signature to these allegedly separate documents.  *See* **Exhibit F**, JR Appx. Bates No. 111.  Finally, a memorandum from Mr. Louis Cohen, the Owner of Priority 1, states that there are "(2) COPIES EACH OF THREE (3) ACKNOWLEDGMENT FORMS IN THE BACK OF EACH [HAND]BOOK."  *See* **Exhibit A**, JR Appx. Bates No. 1 (emphasis in original)[6].  None of this appears to be disputed by P1.

Against the foregoing, P1 sets two items: 1) an inference based on text allegedly displayed during the e-signature process which itemized the Handbook and the Arbitration Policy separately (*see* Opposition at p. 14); and 2) its own unsworn and unsupported *ipse dixit* that the Handbook and

---

[6] Although P1 notes that this memo is dated prior to the start of Ms. Brent's employment with Priority 1, it does not deny that it accurately describes how the physical handbook was distributed.

Arbitration Policy were, in some unspecified fashion, presented as "separate and distinct documents" despite admittedly being part of the same .pdf file. *See* Opposition at p. 13.

P1's allegations do not rise to the level of a genuine dispute as to any material fact. First, P1's unsworn and unsupported assertion that the Handbook and Arbitration Policy were presented separately despite being part of a single .pdf file should be entirely disregarded. As then-Vice Chancellor Strine once explained "colorful rhetoric [of counsel] is no substitute for record evidence." *Goodwin v. Live Entertainment, Inc.*, Civ. No. 15765, 1999 Del. Ch. LEXIS 5 (Ct. Ch. Jan. 22, 1999); *see also Felty*, 785 F.2d at 521 (*quoting Estrella*, 682 F.2d at 819-20 ("Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid summary judgment.")).

P1's remaining allegation does not, even if true, give rise to a genuine dispute as to any material fact. As P1 notes in its Opposition, it "cannot create a genuine dispute of material fact through…compilation of inferences." Opposition at p. 2, *quoting Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001). In other words, P1 cannot prevail by presenting evidence which is "merely colorable, or is not significantly probative." *Liberty Lobby*, 477 U.S. at 249-50.

P1's remaining allegation must likewise be disregarded because it contradicts Ms. Delach's prior sworn testimony. *E.g. Kinser v. United Methodist Agency for the Retarded-W. N.C.*, 613 Fed. Appx. 209, 210-11 (4th Cir. 2015) (Applying the sham-affidavit rule and noting that "an affidavit inconsistent with the affiant's prior deposition testimony" may be disregarded); *citing Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). Ms. Delach was aware of the text now relied on by P1 – indeed, she cited it only two paragraphs before stating that the Arbitration Policy was part of the Handbook. *See* Delach Aff., **Exhibit F** at pars. 5, 7, JR Appx. Bates Nos. 104, 106 (par. 5 contains the itemized list relied on by P1; par. 7 states that even the Attached Policy, which P1 attempts to sever from the Handbook Policy, was "included at the end of the [Handbook].")). P1

11

would not be able to contradict an earlier deposition by filing a subsequent sworn statement and, likewise, cannot contradict an earlier sworn affidavit with an unsworn statement in its brief.  This is especially true because P1 has taken a contrary position in prior briefing.  *See* Motion to Compel at pp. 1, 3, 4, 4 n.6, 12, and 13 (Aug. 14, 2014) (ECF No. 6-1).

   **c.   P1 Had Authority to Unilaterally Modify the Arbitration Policy Even If It Was a Separate Document**

   Even if it was a separate document, Priority 1 retained the authority to unilaterally modify the Arbitration Policy.  In *Caire v. Conifer Value Based Care, LLC*, Judge Bennett addressed facts similar to those present in this case.  982 F. Supp. 2d 582, 585-86 (D. Md. 2013).  In *Caire*, the defendant had propounded a handbook which contained a policy calling for binding arbitration.  *Id.* The handbook, but not the arbitration policy, contained provisions that permitted defendant to unilaterally modify its terms.  *Id.* The section of the handbook which contained the arbitration policy was separately agreed to and had its own signature block, and was also mentioned in the acknowledgment of receipt of the handbook, which was also signed by the employee.  *Id.* at 594. The Court nevertheless held that the arbitration policy was subject to the handbook's unilateral modification clause because "[t]he arbitration provision is a policy described in the employee manual."  *Id.* The Court also rejected the defendant's argument that "to analyze the Defendants' authority to change the arbitration clause this case would require this Court to improperly look beyond the arbitration provision."  *Id.* at 594 n.7.

   This case is strikingly similar to *Caire* and should be resolved in the same fashion.  Both employers issued a handbook which contained an arbitration policy.  Both employers also issued acknowledgment forms which mentioned the arbitration policy.  Both handbooks provided that the employer could unilaterally modify the policies in its handbook.  Significantly, unlike in *Caire*, the Handbook Policy did not contain its own signature block.

**d.  The Arbitration Policy in the Handbook Lacks Consideration**

The only consideration that P1 has identified for the Arbitration Policy is its alleged mutual agreement to arbitrate.  *See* Opposition at p. 15. P1 has not, and cannot, identify any other consideration capable of supporting the Arbitration Policy.  P1 does not dispute that, if the Arbitration Policy is part of the Handbook (which it is), then P1 had the authority to unilaterally modify the Arbitration Policy at any time, without notice.  *See* Handbook at **Exhibit B**, JR Appx. Bates Nos. 7, 94; Acknowledgment at **Exhibit B**, JR Appx. Bates No. 100 (all permitting unilateral modification of P1's policies).  Because P1 could unilaterally modify the Arbitration Policy at any time, its alleged mutual promise was illusory, and the Arbitration Policy lacked consideration and is unenforceable.  *See Cheek v. United Healthcare of Mid-Atlantic, Inc.*, 378 Md. 139, 148-52, 835 A.2d 656 (2002) (holding that Defendant's ability to "alter, amend, modify, or revoke" the arbitration policy "at its sole and absolute discretion at any time with or without notice creates no real promise").

**V.    THE COURT CANNOT APPOINT AN ARBITRATOR**

The Arbitration Policy provides that "Either side may request that [any] dispute be submitted for arbitration to the Maryland state board of mediation with the request that a staff member be appointed to act as arbitrator."  *See* Attached Policy, **Exhibit D**, JR Appx. Bates No. 101.  Neither the "Maryland state board of mediation", nor any similar arbitration provider, ever existed.  *See* Opposition at p. 18, ECF No. 65.  In the absence of an arbitration provider, P1 invokes Section 5 of the Federal Arbitration Act, 9. U.S.C.A. § 1 *et seq.* (the "FAA"), but the text of Section 5 does not authorize the substitution of a provider – only an arbitrator.  Moreover, Section 5 does not apply here, as there has been no "lapse" within the meaning of that section of the FAA.

Finally, Section 5 of the FAA does not authorize a district court to circumvent an exclusive arbitration forum integral to the parties' agreement.  *See Ranzi v. Tijerina*, 393 Fed. Appx. 174, 176 (5th Cir. 2010) ("Section 5 does not, however, permit a district court to circumvent the parties'

designation of an exclusive arbitration forum when the choice of that forum is an integral part of the agreement to arbitrate[.]") (internal quotes omitted)); *Gutfreund v. Weiner*, 68 F.3d 554, 561 (2d Cir. 1995) (Section 5 cannot "circumvent the parties' designation of an exclusive arbitral forum.").

Judge Ellis recently set forth the reasoning for this principle. In *Job v. Simply Wireless, Inc.*, a contract dispute, Judge Ellis reviewed the Court's authority under section 5 of the FAA:

> [T]he presumptive default for resolving disputes is litigation in court; and thus, **where parties to a contract agree to deviate from the default by availing themselves of arbitration but only, for instance, before a specific arbitrator, the unavailability of that specific arbitrator does not trigger the appointment of a substitute arbitrator** if the limited deviation was central to the agreement to arbitrate…[because] **an intent to arbitrate in a *specific* forum does not necessarily manifest an intent to prefer arbitration over litigation in all circumstances**.

No. 1:15-cv-676, 2015 U.S. Dist. LEXIS 171535 at *15-*16 (E.D. Va. Dec. 22, 2015) (Ellis, J.) (emphasis added) (internal quotations omitted). This holding reflects the "first principle that… [a]rbitration is strictly a matter of consent." *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 299 (2010) (internal quotes omitted).

The named arbitration provider is integral to the agreement because the parties have agreed that arbitration before the Maryland state board of mediation is their exclusive forum for resolving disputes. *See Ranzy v. Tijerina*, 393 Fed. Appx. 174, 175 (5th Cir. 2010) (applying Section 5 and noting that "where the parties' agreement specifies that the laws and procedures of a particular forum shall govern any arbitration between them, that forum-selection clause is an "important" part of the arbitration agreement.")

## VI.   CONCLUSION

WHEREFORE, Ms. Brent respectfully prays that her Motion for Summary Judgment be

GRANTED, and the Proposed Order attached thereto be entered.

Respectfully submitted,                                                    Date: February 2, 2016

_____/S/_____
Robert B. Fitzpatrick, Esq.
ROBERT B. FITZPATRICK, PLLC
D. Md. Bar No. 02506
1825 Connecticut Avenue, N.W., Suite 640
Washington, D.C. 20009-5728
(202) 588-5300 (phone)
(202) 588-5023 (fax)
fitzpatrick.law@verizon.net (email)

*Attorney for Plaintiff*